**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.*, | ) | |
| **BRIAN E. CONNER, M.D.,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 01-2269-CM** |
| | ) | |
| **SALINA REGIONAL HEALTH CENTER,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff-Relators Brian E. Conner, M.D. and Brian E. Conner, M.D., Chartered (collectively "Conner"), bring this *qui tam* action alleging that defendant Salina Regional Health Center has repeatedly violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA").  Specifically, Conner alleges that each time defendant filed an annual Medicare cost report and certified that its services were in compliance with the laws and regulations governing healthcare services, defendant presented false claims to the government. According to Conner, defendant provided medical services that failed to meet the governing standards of care and solicited kickbacks from Conner, which meant that the reimbursement claims for those services were false.  Conner also claims that defendant discharged him from its medical staff in retaliation for his complaints, and asserts three additional claims under state law regarding defendant's refusal to reappoint Conner to its medical staff.

Pending before the court are two motions:  Defendant Salina Regional Health Center, Inc.'s Motion

to Dismiss and for Summary Judgment (Doc. 73) and Defendant Salina Regional Health Center, Inc.'s

Motion for Partial Summary Judgment (Doc. 71).  For the following reasons, the court grants Doc. 73 in

part and denies it in part, and denies Doc. 71 as moot.

## I.  STANDARDS OF REVIEW

Defendant moves to dismiss Conner's complaint for failure to state a claim pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure, and moves for summary judgment pursuant to Rule 56.

A Rule 12(b)(6) motion to dismiss will be granted only if it appears beyond a doubt that the plaintiff is

unable to prove any set of facts entitling him to relief under his theory of recovery.  *Conley v. Gibson*, 355

U.S. 41, 45-46 (1957).  "All well-pleaded facts, as distinguished from conclusory allegations, must be

taken as true."  *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).  The issue in reviewing the

sufficiency of a complaint is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer

evidence to support his claims.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other*

*grounds by Harlow v. Fiztgerald*, 457 U.S. 800 (1982).

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue

as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In

applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most

favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The parties have attached evidence to their pleadings regarding some issues, but not others.

Accordingly, the court will apply both standards as appropriate in this case.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Brian E. Conner, M.D. is an ophthalmologist who maintained medical staff privileges with defendant until 1997.  Brian E. Conner, M.D., Chartered, employs Conner and is the professional association through which he practices medicine.  Defendant is a private hospital in Salina, Kansas, and has been accredited by the Joint Commission on Accreditation of Hospitals ("JCAHO") and the Healthcare Facilities Accreditation Program of the American Osteopathic Association ("HFAP") beginning in 1990 and during all times relevant to this case.

Conner claims that beginning no later than 1987, defendant has engaged in a pattern of healthcare practice, mismanagement, and fraud that has systematically violated the conditions of participation and eligibility standards under the Medicare/Medicaid program.  Conner claims that defendant has repeatedly violated the applicable healthcare regulations and statutes, but has sought reimbursement for its services and annually certified that it is in compliance with the regulations and statutes.  A few of the ways that Conner claims defendant violated the regulations and statutes are: (1) by failing to provide adequate nurses and other personnel; (2) by failing to establish a quality assurance program that meets regulatory standards; (3) by failing to properly maintain medical records; and (4) by "dumping" patients without proper screening, evaluation, and treatment.[2]  Despite these violations, Conner claims, each year, defendant filed a detailed cost report with the Centers for Medicare and Medicaid Services.  In the cost report, one of defendant's officers or administrators expressly certified that "I am familiar with the laws and regulations regarding the provision of healthcare services and that the services identified in this cost report were provided in

---

[1]  The uncontroverted facts are taken from the record and viewed in the light most favorable to plaintiff.

[2]  This list is by no means exhaustive.

compliance with such laws and regulations."

The Secretary of Health and Human Services ("HHS") used the cost report as part of its procedure for determining amounts that should be paid under Medicare for defendant's services. *See* 42 U.S.C. § 1395g (requiring Secretary to periodically determine the amount to be paid). Not less than monthly, a fiscal intermediary under contract with HHS calculates and dispenses estimated periodic payments to hospitals. These interim payments are made "on an estimated basis prior to an audit which determines the precise amount of reimbursement due to the provider." *In re TLC Hosps., Inc.*, 224 F.3d 1008, 1011 (9th Cir. 2000). At the end of each reporting year, the fiscal intermediary conducts an audit, relying on the annual cost report. 42 C.F.R. § 405.1803(a). "The audit entails a reconciliation of the amount due to the provider under the Medicare statute with the amount of estimated interim payments dispensed for the same period. Thus, the audit reveals the precise amount of any overpayments or underpayments." *TLC*, 224 F.3d at 1012. The hospital must repay any overpayments. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 405.1803(a).

On September 25, 1995, Conner's then-attorney, Tom Theis, contacted the Kansas Foundation for Medical Care, Inc. about the "broad spectrum of issues" that are the subject of this case. The Foundation, which is a private corporation, is the healthcare quality improvement organization for Kansas. It contracts with Medicare to do reviews on quality of care. Conner's complaints were forwarded to the Kansas Board of Nursing, and the Kansas Department of Health and Environment subsequently conducted a "risk management site review" on defendant. On April 18, 1996, the Department of Health and Environment sent defendant a letter in which it found defendant to be in "substantial compliance" with the Kansas state risk management laws and regulations.

On February 3, 1997, defendant denied Conner's application for reappointment to defendant's medical staff.  Thereafter, Conner requested and received a due process hearing.  The hearing officer recommended that Conner's application be denied, and Conner appealed the decision.  Defendant's review panel affirmed the officer's recommendation.

On October 17, 1997, Conner filed a motion for temporary restraining order in the District Court of Saline County, Kansas to enjoin defendant from denying Conner's application for reappointment, which the court denied.  On October 1, 1999, Conner filed an action in the United States District Court for the District of Kansas, claiming that defendant violated his due process rights under 28 U.S.C. § 1983.  Conner also included supplemental claims for breach of contract, tortious interference, and injunctive relief.  On September 21, 2000, this court dismissed Conner's § 1983 claim, and declined to exercise supplemental jurisdiction over the remaining claims.  Conner then filed another state court action in Saline County on October 26, 2000, which included the identical breach of contract, tortious interference, and injunctive relief claims that Conner alleged in the § 1983 case.

On June 1, 2001, Conner filed this action *in camera* and under seal, alleging violations of the FCA.  On February 12, 2004, Conner dismissed the second Saline County action without prejudice.  On June 16, 2004, Conner filed his Third Amended Complaint in the instant case.  In his Third Amended Complaint, Conner added the state law claims, which he previously had asserted in the § 1983 case and the second Saline County case.  Conner served the Third Amended Complaint on counsel for defendant on September 21, 2004.  The United States government has declined to intervene in this case.

## III.  DISCUSSION

## A.  Did Conner fail to plead fraud with particularity?

Defendant first claims that Conner's claims fail because Conner failed to plead fraud with particularity, as required by Fed. R. Civ. P. 9(b).  The court has reviewed Conner's Fourth Amended Complaint, which spans seventy-five pages of text and 284 pages of exhibits.  The court finds that it contains sufficient detail to allow defendant to prepare an adequate responsive pleading.  *See VNA Plus, Inc. v. Apria Healthcare Group, Inc.*, 29 F. Supp. 2d 1253, 1263 (D. Kan. 1998) (citations omitted).  The court will not dismiss the complaint for failure to comply with Rule 9(b).

**B.  Is government payment conditioned on certification of compliance with statutes and regulations?**

Defendant next claims that, even assuming (without admitting) that defendant falsely certified that it was in compliance with statutes and regulations, the government did not rely on the certification in determining whether it had properly reimbursed defendant for healthcare services.  According to defendant, reliance is lacking because the statutes and regulations at issue do not expressly require compliance as a prerequisite to receiving government payment.  Plaintiff counters that the cost reports that included the certification are required by law, and final Medicare payments are expressly conditioned upon a truthful annual cost report certification.  The court has reviewed the extensive case law cited by the parties on this issue, and understands the positions advocated by both sides.

To establish an FCA violation, Conner must show that defendant submitted a false claim for payment to the United States government.  31 U.S.C. § 3729(a)(1)-(2); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 810 (10th Cir. 2002).  The FCA was not intended to address every type of alleged wrongful act or statutory violation.  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) (citing *United States v. McNinch*, 356 U.S. 595, 599 (1958)).  And the FCA does not impose liability for the underlying alleged statutory violation; rather, the key issue is whether

defendant presented a false or fraudulent claim to the government. *Id.*

Conner relies on what has been termed the "false certification theory" of liability. This theory "is predicated upon a false representation of compliance with a federal statute or regulation or a prescribed contractual term." *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001). Another term for this theory is the "legally false" certification theory, *id.* at 698, which differs from the "factually false" certification theory in that the "factually false" theory "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided," *id.*; *see also United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 496-97 (S.D. Tex. 2003) (citation omitted). Conner does not allege that defendant made any factually false claims for medical services.

A legally false certification of compliance with a statute or regulation cannot form a viable FCA cause of action unless payment is **expressly conditioned** on that certification. *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) ("An FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements also requires that the certification of compliance be a condition of or prerequisite to government payment."); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004) ("[A] false certification of compliance creates liability when certification is a prerequisite to obtaining a government benefit."); *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 382-83 (5th Cir. 2003) ("The False Claims Act does not create liability merely for a healthcare provider's disregard of government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asked the government to pay amounts it does not owe." (citation omitted)); *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 413-14 (6th Cir. 2002); *Mikes*, 274 F.3d

-7-

at 697 ("We join the Fourth, Fifth, Ninth, and District of Columbia Circuits in ruling that a claim under the

[FCA] is legally false only where a party certifies compliance with a statute or regulation as a condition to

governmental payment."); *United States ex rel. Siewick v. Jamieson Sci. & En'g, Inc.*, 214 F.3d 1372,

1376 (D.C. Cir. 2000) ("[A] false certification of compliance with a statute or regulation cannot serve as

the basis for a qui tam action under the [FCA] unless payment is conditioned on that certification.");

*Harrison*, 176 F.3d at 786-87; *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266-67 (9th Cir.

1996) ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA.  It is

the false certification of compliance which creates liability when certification is a prerequisite to obtain a

government benefit."); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 335 (D. Conn. 2004);

*United States ex rel. Barrett v. Columbia/HCA Health Care Corp.*, 251 F. Supp. 2d 28, 32 (D.D.C.

2003); *Graves*, 284 F. Supp. 2d at 498; *United States ex rel. Swan v. Covenant Care, Inc.*, 279 F.

Supp. 2d 1212, 1221 (E.D. Cal. 2000).  For the reasons set forth below, the court finds that in this case,

payment was not expressly conditioned on defendant's certification, and the court dismisses Conner's

claims.

Conner alleges that defendant violated the following statutes and regulations:  (1) 42 C.F.R. §§

482.1 *et seq.*; (2) 42 U.S.C. § 1395dd; (3) 42 U.S.C. § 2000d; (4) 42 U.S.C. § 1320a-7(b)(6)(B); (5)

42 U.S.C. § 1320a-7(b)(7); (6) 42 U.S.C. § 1320a-7b(b); and (7) 42 U.S.C. § 1320a-7b(a)(3).

Defendant claims that the first five of these statutes/regulations do not expressly require perfect compliance

with the "conditions of participation" as a prerequisite to receiving government payments.[3]  The court

---

[3]  Defendant does not argue that the Anti-kickback statute (42 U.S.C. §§ 1320a-7b) does not
require certification before payment.  Several courts have found violations of this statute may state a claim
under the FCA.  *See, e.g., United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.

(continued...)

agrees.

The regulations on which Conner relies, 42 C.F.R. §§ 482.1 *et seq.*, set out the conditions of participation for hospitals. The statutory basis for these regulations is 42 U.S.C. § 1395x(e). Neither 42 C.F.R. § 482.1 nor 42 U.S.C. § 1395x(e) expressly conditions payment on certification with these requirements. *Cf. United States ex rel. Ben-Shlush v. St. Luke's-Roosevelt Hosp.*, 2000 WL 269895, at *3 (S.D.N.Y. Mar. 10, 2000) (holding that plaintiff failed to state a claim in part because 42 C.F.R. § 482.43 did not mandate certification).

Conner also alleges that defendant offered services to patients "of a quality which fails to meet professionally recognized standards of health care" in violation of 42 U.S.C. § 1320a-7(b)(6)(B). Conner cannot state a claim under § 1320a-7(b)(6)(B) for several reasons. First, § 1320a-7(b) is entitled "Permissive Exclusion" and provides that "the Secretary **may** exclude the following individuals and cease participation in any federal health care program . . . ." (emphasis added). As opposed to 42 U.S.C. § 1320a-7(a)'s "Mandatory Exclusion," subsection (b) provides "permissive" exclusion at the Secretary's discretion. This statute does not expressly condition payment upon certification. *See Mikes*, 274 F.3d at 696. Likewise, neither 42 U.S.C. § 1395dd nor 42 U.S.C. § 2000dd expressly condition payment on certification, and the court has not found a case holding otherwise.

Denial of government payment is not the exclusive remedy of HHS in the event of a regulatory

---

[3]  (...continued)
Supp. 2d 1017 (S.D. Tex. 1998), *cited with approval and followed in Barrett*, 251 F. Supp. 2d at 32; *United States ex rel. Pogue v. Diabetes Treatment Ctr. of Am., Inc.*, 238 F. Supp. 2d 258, 265-66 (D.D.C. 2002); *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 43 (D. Mass. 2000); *United States ex rel. Bidani v. Lewis*, 1998 WL 1820753, at *9 (N.D. Ill. Dec. 29, 1998). Because defendant has not raised the issue, the court does not comment on it here. Defendant moves to dismiss Conner's Anti-kickback claims on a different basis.

violation.  In fact, the Social Security Act provides the Centers for Medicare and Medicaid Services

("CMS") with discretionary authority whether to impose sanctions in a particular case.  *See Swan*, 279 F.

Supp. 2d at 1222.

> To allow FCA suits to proceed where government payment of Medicare claims is not
> conditioned on perfect regulatory compliance – and where HHS may choose to waive
> administrative remedies, or impose a less drastic sanction than full denial of payment –
> would improperly permit qui tam plaintiffs to supplant the regulatory discretion granted to
> HHS under the Social Security Act, essentially turning a discretionary denial of payment
> remedy into a mandatory penalty for failure to meet Medicare requirements.

*Id.* (citing *Hopper*, 91 F.3d at 1267; *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d

1013, 1020 (7th Cir. 1999)).

Section 1864(a) of the Social Security Act (42 U.S.C. § 1395aa) authorizes CMS to utilize a state

survey agency (the Kansas Department of Health and Environment) to review hospitals participating in

Medicare.  42 C.F.R. § 488.11 authorizes the state survey agency to make determinations of compliance

with the conditions of participation and the state agency then makes recommendations to CMS.  Under

C.F.R. § 488.24, if the state agency finds that a provider is not in substantial compliance with the conditions

of participation, then the provider must submit a corrective action plan (pursuant to C.F.R. § 488.28) within

a reasonable time.  This prospective plan would be designed to address any recommendations proposed by

the state agency – not strip the provider of all past Medicare payments.  *See generally United States ex*

*rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 19 (D.D.C. 2003) (noting that even if the

hospital lacked JCAHO accreditations, CMS would not deny payment until after the state performed a

survey).

If plaintiff's argument is accepted, the FCA would allow courts to take away all money a hospital

received from Medicare even though the agencies charged with the enforcement of Medicare statutes and

regulations would not have done so.[4]  *See Hopper*, 91 F.3d at 1267 (holding that FCA may not be used as a substitute for administrative remedies where the regulatory compliance is "not a *sine qua non* [for the] receipt of state funding"); *Lamers*, 168 F.3d at 1020 (holding that a *qui tam* plaintiff may not use the FCA to "preempt" a federal agency's "discretionary decision not to pursue regulatory penalties;" "the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations").

Allowing Conner to proceed with his claims that defendant did not provide quality of care which met medical standards:

> would promote federalization of medical malpractice, as the federal government or the *qui tam* relator would replace the aggrieved patient as a plaintiff.  Beyond that, we observe that the courts are not the best forum to resolve medical issues concerning levels of care.  State, local, or private medical agencies, boards, and societies are better suited to monitor quality of care issues.

*Mikes*, 274 F.3d at 700; *see also United States ex rel. Swafford v. Borgess Med. Ctr.*, 98 F. Supp. 2d 822, 828 (W.D. Mich. 2000) ("The FCA is not an appropriate vehicle for policing technical compliance with administrative regulations.") (quoting *Lamers*, 168 F.3d at 1020).  Significantly, in this case, both JCAHO and HFAP, despite multiple complaints by Conner, found that defendant met the conditions of participation and accredited defendant.

The court realizes that other courts have reached a different conclusion in cases involving the Anti-kickback statute.  *See, e.g., Thompson*, 20 F. Supp. 2d at 1046, *cited with approval and followed in Barrett*, 251 F. Supp. at 32; *Pogue*, 238 F. Supp. 2d at 265-66; *Kneepkins*, 115 F. Supp. 2d at 43; *Bidani*, 1998 WL 1820753, at *9.  But the court is mindful of the mandate that the FCA was not designed

---

[4]  Plaintiff interprets this line of reasoning as a "primary jurisdiction" argument.  The court does not regard it as such.

to reach all fraud practiced on the government, *see Harrison*, 176 F.3d at 785 (citing *McNinch*, 356 U.S. at 599), and finds that the situation in the case at hand does not fall within the purview of the FCA.[5]  The court does not believe Congress intended for the FCA to apply to the types of claims at issue here.

The court also finds that the Tenth Circuit case of *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519 (10th Cir. 2000) does not require a different result.  In *Shaw*, the defendant entered into a contract with the government to perform photography services at an Air Force base.  213 F.3d at 523. The plaintiff, a former employee, claimed that the defendant had submitted false work orders to the government for work that was never performed, and that the defendant submitted invoices in which it falsely impliedly certified that it complied with the contractual requirements to recover silver from photography chemicals when, in fact, it failed to do so.  *Id.* at 530-31.  The defendant had submitted work orders and monthly invoices to the government prior to receiving an "equitable adjustment" by which the government paid additional money (beyond an original fixed price) for the photography work.  *Id.* at 522-25.  The defendants argued that "neither the work orders nor the invoices . . . constitute false or fraudulent claims." *Id.* at 529.  They reasoned that work orders could not qualify as instruments of fraud because "only claims submitted for the purpose of receiving payment are actionable under the FCA."  *Id.* at 530.  As for the monthly invoices, the defendants argued "that the monthly invoices which they submitted could not be false or fraudulent because the invoices only billed the amount called for by the fixed price contract and did not contain any factual misrepresentations . . . ."  *Id.* at 531.

The *Shaw* court held that the plaintiff stated a claim for implied false certification of contractual

---

[5]  The Supreme Court has also stated that the FCA extends "to all fraudulent attempts to cause the Government to pay out sums of money," *United States v. Niefert-White Co.*, 390 U.S. 228, 233 (1968), but the court finds that the context of that particular broad statement limits its applicability.

compliance. *Id.* at 533.  In a string cite, *Shaw* cited *Pogue v. Am. Healthcorp, Inc.*, 914 F. Supp. 1507

(M.D. Tenn. 1996) in support of its position that an implied certification claim was actionable.  213 F.3d at

532.  Notably, *Pogue* held that by submitting Medicare claims, the defendants implicitly certified

compliance with the statutes, rules, and regulations governing the Medicare program.

 *Shaw* is distinguishable from the instant case.  *Shaw* was an "archetypical qui tam FCA action"

involving "an insider at a private company who discovers [her] employer overcharged under a government

contract."  *Hopper*, 91 F.3d at 1266.  It involved implied certification of compliance with a discrete

contract, where the defendant billed for services it did not perform.  Here, Conner does not allege that

defendant billed for services never performed.  Rather, he claims that those services were not provided in

compliance with a plethora of healthcare laws and statutes.  The court also finds that *Shaw*'s citation of

*Pogue* does not suggest that this court must follow *Pogue*.  The citation was made in a different context,

and *Shaw* did not directly consider whether the statutes and regulations at issue in this case could serve as

the basis for an FCA action.

 Finally, the court notes that Conner's complaint alleges the materiality element at issue here.

Specifically, the complaint alleges:

> The United States Government, through HHS, CMS and its intermediaries and carriers, has
> a right to rely — and does rely — upon the representations and statements made by
> providers and suppliers in connection with their claims for reimbursement, including the
> certification that underlying healthcare services were provided under circumstances
> satisfying all of the subject Program's conditions of participation.

The pleading also states: "The United States, unaware of the falsity of the records, statements, and claims

made or submitted by defendants, paid and continues to pay defendants for claims that would not be paid if

the truth were known."  These allegations are conclusory, contrary to the statutes and regulations, and do

not appear to be based on a reasonable interpretation of the statutes and regulations. Likewise, the fact

that the Medicare provider application used beginning in 2001 states, "I understand that payment of a claim

by Medicare or other federal health care programs is conditioned on the claim and the underlying

transaction complying with such laws, regulations and program instructions (including the anti-kickback

statute and the Stark laws). . ." does not convince the court that the materiality element is an issue for the

jury. The fact remains that the statutes and regulations at issue here do not require certification of

compliance as a condition to government payment.

## C. Has Conner stated a claim for violation of the FCA based on the Medicare Anti-kickback statute, 42 U.S.C. § 1320a-7b?

Conner claims that in order to continue to receive privileges with defendant, including the right to

receive patient referrals from the hospital's emergency room, he was required to provide his own operating

room staff. Conner claims that this qualifies as a "kickback," because it provided a benefit to the hospital,

yet the hospital continued to receive full Medicare reimbursement. According to Conner, he was forced to

financially induce the hospital to furnish him with privileges and Medicare referrals. His claim is based on a

demand made by defendant on May 6, 1996:

> Many disputes have arisen with you over after-hours staffing for retinal reattachment procedures. If surgical scrub staff assigned to work with you do not meet your needs, you will be responsible for contracting with preferred scrub staff for your procedures. This applies to all cases during regular department hours; however, it particularly applies to procedures occurring after regular work hours (after 5:00 p.m.). Individuals contracting with or employed by you for such procedures would need to be credentialed as healthcare associates as required under the Medical Staff Bylaws.

The court finds that these allegations fail to state a claim because Conner merely alleges a dispute

between two healthcare providers about valid and legal ways to provide surgical support, which does not

affect Medicare payments. Kansas law does not prohibit Conner from using his own surgical scrub

-14-

personnel if he so chooses.  *See* K.A.R. §§ 28-34-5a and 28-34-17b.[6]  And the parties have not pointed the court to any Medicare statutes or regulations which prohibit defendant from allowing Conner to use his own scrub staff.  Accordingly, Conner cannot state a claim for violation of the anti-kickback statute when defendant proposed an agreement which was allowed and contemplated by law.

42 U.S.C. § 1320a-7b(a)(3) provides a penalty for anyone who, having knowledge of an event affecting his right to payments, conceals or fails to disclose such event in an attempt to fraudulently secure such payments.  Because the court finds that the hospital's scrub staff proposal did not constitute a kickback, defendant did not have a duty to disclose these alleged "events" to the government pursuant to 42 U.S.C. § 1320a-7b(a)(3).  His claim under § 1320a-7b(a)(3) must also fail because there were no "events" to report.

**D.  Did Conner fail to state a claim under the reverse false claim provision because the government did not owe a specific legal obligation at the time of the alleged false statement?**

In Count Three, Conner claims that defendant "failed to disclose to the Government material facts that would have resulted in substantial repayments by them to the federal and state governments."  Conner claims that defendant concealed facts from the government to avoid repayment of the allegedly false claims in violation of 31 U.S.C. § 3729(a)(7).  The Tenth Circuit has not yet addressed the contours of this statute that are relevant here, but other Circuits have held that under this "reverse false claim" theory, Conner:

> must demonstrate that the Government was owed a specific, legal obligation at the time the alleged false record or statement was made.  The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment or acknowledgment of indebtedness.

---

[6]  Conner neither argues that these two regulations prohibit the practice, nor that any other Kansas regulation prohibits the practice.

-15-

*United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997); *see Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 736 (6th Cir. 1999) (rejecting a broad interpretation of the reverse false claim provision, and holding that a reverse false claim action can only proceed where the defendant owed the government "an obligation sufficiently certain to give rise to an action of debt at common law"); *see also United States ex rel. Bahrani v. Conagra, Inc.*, 338 F. Supp. 2d 1202, 1205 (D. Colo. 2004); *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 855 (S.D. Tex. 2003).  Moreover, any potential liability for future fines or sanctions at some indefinite point in the future for some unknown amount is not an "obligation to pay" under 31 U.S.C. § 3729(a)(7).  *Graves*, 284 F. Supp. 2d at 509.  The court finds that defendant's "potential liability" is unknown and indefinite and is not an "obligation to pay" under § 3729(a)(7).  The government was not "the beneficiary of any judgment or acknowledgment of indebtedness" by the defendant and any "obligations" were merely contingent, as evidenced by the court's ruling earlier in this Memorandum and Order.  *See Reagan*, 274 F. Supp. 3d at 855.  For this reason, Count Three is dismissed.

**E.  Does Conner's conspiracy claim fail?**

Conner alleges in Count Four that defendant and Via Christi Health System, Inc. ("Via Christi"), a prior defendant in his lawsuit, conspired to limit physician criticisms.  To state a claim under 31 U.S.C. § 3729(a)(3) for conspiracy, Conner must show that: (1) defendant agreed with Via Christi to get a false or fraudulent claim paid by the United States; and (2) defendant or Via Christi performed an act to effect the object of the conspiracy.  *Graves*, 284 F. Supp. 2d at 509.  Because Conner's FCA claims fail to state a claim, there can be no conspiracy.  Conner's conspiracy count, therefore, fails as a matter of law.  *See United States ex rel. Atkins v. McInteer*, 345 F. Supp. 2d 1302, 1304-05 (N.D. Ala. 2004); *United*

*States ex rel. Sanders v. Allison Engine Co.*, 364 F. Supp. 2d 713, 715 (S.D. Ohio 2003).

**F.  Does Conner's claim for retaliatory discharge fail because he was not an "employee" of defendant?**

In Counts Five and Six, Conner alleges that he and his professional association, Brian E. Conner, M.D. Chartered, suffered retaliatory discharge from defendant for Conner's "investigation and assertion of the errors, omissions, shortcomings . . . of SRHC."  Defendant argues that it was never the "employer" of Conner or his professional association.  According to defendant, Conner was a physician who was a member of defendant's medical staff by virtue of his medical privileges.  As alleged in his Fourth Amended Complaint, Conner's "employer" was Brian E. Conner, M.D. Chartered.  And Conner does not allege that he or his professional association was ever employed by defendant.  Defendant claims that under the "ordinary and natural meaning" of the term "employer," Conner, as an independent physician with medical privileges at defendant's facility, cannot maintain a retaliatory discharge claim.  *See United States ex rel. Lamar v. Burke*, 894 F. Supp. 1345, 1347 (E.D. Mo. 1995) (applying the "ordinary and natural meaning" of the term when construing the term "employer" under the FCA).

For Conner's retaliatory discharge claim to be viable, defendant must be the "employer" of Conner and his professional association.  *See United States ex rel. Golden v. Ark. Game & Fish Comm'n*, 333 F.3d 867, 870 (8th Cir. 2003) (holding that the relator's FCA retaliation claim failed because such claim can only be against an employer) (citation omitted); *United States ex rel. Siewick v. Jamieson Science & En'g, Inc.*, 322 F.3d 738, 740 (D.C. Cir. 2003) (same); *Vessell v. DPS Assocs. of Charleston, Inc.*, 148 F.3d 407, 412 (4th Cir. 1998) (holding that the anti-retaliation provision of the FCA does not cover independent contractors).  The FCA does not define the term "employee" or "employer."  And the Tenth Circuit has not addressed the meaning of the terms in the context of the FCA.  In this void, the court finds

case law analyzing Title VII of the Civil Rights Act of 1964's retaliatory provision instructive. Title VII cases have not restricted the definition of "employer" to a servant situation. *See, e.g., Owens v. Rush*, 636 F.2d 283, 287 (10th Cir. 1980); *Livingston v. Ewing*, 601 F.2d 1110, 1114 (10th Cir. 1979). Rather, courts have examined the true nature of the relationship to determine whether the parties have an employment relationship or an independent contractor relationship. *See, e.g., Lambertsen v. Utah Dep't of Corr.*, 79 F.3d 1024, 1028 & n.1 (10th Cir. 1996).

Conner admits in his brief that defendant was not "Dr. Conner's employer in the classic sense." Conner further admits that he was not salaried at the hospital, and that defendant did not provide him employee benefits such as retirement benefits or Social Security contributions. But Conner alleges that defendant significantly affected his access to employment opportunities. He also alleges that defendant attempted to control the manner in which Conner and other staff physicians practiced medicine. And he alleges that he should be considered a former employee of defendant and that "he has been discharged, demoted, suspended, threatened, harassed or in other manners discriminated against with respect to his position of employment with [defendant], and his ability to earn a living as an employee effectively destroyed." The court concludes that these allegations, taken in the light most favorable to Conner, adequately allege that defendant was Conner's employer under the FCA.

Defendant argues in a footnote in its reply that Counts Five and Six also fail to state a claim on another basis: Conner has not alleged that defendant knew that Conner was acting in furtherance of a *qui tam* action when defendant denied his application for reappointment to hospital staff. *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996) (dismissing retaliation claim for failing to allege a causal connection between discharge and any conduct in furtherance of a *qui*

*tam* action).  *Ramseyer* holds that in order to maintain a retaliation claim, the plaintiff must have put the defendant on notice that he was acting in furtherance of a *qui tam* action – i.e., that he planned to contact government officials or pursue his own *qui tam* action.  *Id.* at 1523.  In Conner's Fourth Amended Complaint, he alleges that he complained to defendant's representatives only about "various quality-of-patient-care issues," not about any claims defendant submitted to the government for payment.

Conner's retaliation claims are not subject to the Rule 9(b) particularity requirements.  But the Tenth Circuit in *Ramseyer* affirmed the dismissal of the retaliation claim even under the less stringent Rule 8 pleading requirements, stating that "plaintiff has never sought leave to pursue further amendment of her pleadings in light of the deficiency identified by defendants, and nothing presented in the briefs on appeal suggests corrective amendment would be possible in any event."  *Id.*  In this case, however, the court notes that Conner sought leave to amend his complaint to remedy any deficiencies the court identified (although not with respect to this particular argument).  The court cannot tell whether corrective amendment would be possible, but the court will grant plaintiff leave to amend his complaint, if appropriate, to include allegations that any retaliatory action by defendant was in response to conduct in furtherance of a *qui tam* action.

The court dismisses Counts Five and Six under *Ramseyer*, but grants Conner leave to amend his complaint within twenty days to properly allege his retaliatory discharge claims.

**G.  Are the state law claims barred by the statute of limitations?**

Defendant claims that Conner's state law claims are barred by the statute of limitations because Conner accomplished service of the Third Amended Complaint in an untimely manner.  The three state law claims – which accrued on October 17, 1997 –  were part of the Saline County state court case that was dismissed on February 12, 2004 without prejudice.  Under K.S.A. § 60-518, Conner had six months to

refile these claims in order for them to have "commenced" within the statute of limitations.  Conner filed his Third Amended Complaint on June 16, 2004, adding the state law claims.  But he did not serve the Third Amended Complaint on defendant until September 21, 2004 – ninety-seven days after he filed it.

Under Kansas law, when service occurs more than ninety days after filing the complaint, the action is commenced at the time the complaint is served.  K.S.A. § 60-203(a)(2).  Defendant therefore argues that under K.S.A. § 60-203, Conner did not "commence" a new action of the state law claims until September 21, 2004, which was more than six months after the dismissal of the Saline County action on February 12, 2004.

The court recognizes that a federal court generally applies state law when determining whether a state law claim was commenced for purposes of the statute of limitations and K.S.A. § 60-518.  *See Smith v. Douglas Cable Commc'ns. L.P.*, 1993 WL 455249, at *3 (D. Kan. Oct. 15, 1993).  But an important distinction in this case is the fact that Conner's supplemental state law claims are contained within an *amended* complaint.  When a complaint is filed in federal court, the matter of relation-back of amendments to pleadings is governed by the Federal Rules of Civil Procedure.  *See Kout v. United States*, 241 F. Supp. 2d 1183, 1191 (D. Kan. 2002) (citation omitted).  Rule 15(c) provides that if the claims in an amended complaint "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading," the amendment date of the pleading relates back to the date of the original pleading.  The court finds that the allegations contained in Conner's state law claims do arise out the conduct set forth in the original pleading in this case.  The relation-back date, therefore, is June 1, 2001 – well prior to ninety days after plaintiffs dismissed their Saline County action.  The court will not dismiss the state law claims as untimely filed.

-20-

**IT IS THEREFORE ORDERED** that Defendant Salina Regional Health Center, Inc.'s Motion to Dismiss and for Summary Judgment (Doc. 73) is granted in part and denied in part. The court dismisses Counts One, Two, Three, Five, and Six, but grants plaintiff leave to amend Counts Five and Six within twenty days in accordance with this Memorandum and Order.

**IT IS FURTHER ORDERED** that Defendant Salina Regional Health Center, Inc.'s Motion for Partial Summary Judgment (Doc. 71) is denied as moot.

Dated this 8th day of May 2006, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**

-21-